UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

JOHN HANSON,                          )
                                      )
        Plaintiff,                    )
                                      )        No. 5:14-CV-99-REW
v.                                    )
                                      )        MEMORANDUM OPINION
MADISON COUNTY DETENTION              )              AND ORDER
CENTER, et al.,                       )
                                      )
        Defendants.                   )
                        ***  ***  ***  ***

        In this case, centering on the February 24, 2013, detention of Plaintiff, John

Hanson, at the Madison County Detention Center (MCDC), Plaintiff and the Madison

County Defendants filed cross-motions for summary judgment. DE #127 (Madison

County Defendant's Motion); DE #130 (Plaintiff's Motion). Each party responded. DE

#138 (Madison County Defendant's Response); DE #140 (Plaintiff's Response).

Defendants replied, DE #150 (Reply to DE #140), but Plaintiff did not. The motions are

ripe for consideration.[1] For the following reasons, the Court fully **GRANTS** DE #127

---

[1] The Court applies the same standard of review to cross-motions for summary judgment as when only one party files. *McKim v. New Market Techs., Inc.*, 370 F. App'x 600, 603 (6th. Cir. 2010). The Court evaluates each motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration. *Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 902 (6th Cir. 2010). Summary judgment for one side is not necessarily appropriate simply because the parties file cross-motions for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) (footnote omitted). Indeed, "'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720 (3d ed. 1998)).

and **DENIES** DE #130. Various immunity doctrines and legal principles shield each Madison County Defendant from every claim.

## I.     Relevant Factual and Procedural Background

Hanson's complaint stems from alleged mistreatment during a brief detention at MCDC following his arrest for disorderly conduct in Richmond, Kentucky. Generally, Hanson contends that deputy jailers subjected him to excessive force by unnecessarily and improperly restraining him and deploying pepper spray and tasers to incapacitate him during the detention. In addition to the constitutional claims, Hanson raises several related state law claims, including common law negligence, negligent hiring, training, and supervision, assault and battery, and negligent and intentional infliction of emotional distress.

On February 23, 2013, Hanson and a group of friends spent their day at the river in Madison County grilling and simply "hanging out." DE #127-2 (Hanson Dep.), at 20-23. After their day at the river, the group returned to a home and prepared for a night out. *Id.* The friends decided to go to JerZees, a bar in downtown Richmond. *Id.* While awaiting a taxi, Hanson consumed 4 beers in a 30 minute time period. *Id.* at 23. The group arrived at JerZees at approximately 11:30 p.m. *Id.* at 24. In the next hour and a half, Hanson, with his friends, consumed "a couple of shots" and "a couple of beers" prior to the bar closing at 1:00 a.m. *Id.*

At the bar's closing, Hanson's trouble began. According to Hanson, as he closed his tab at the bar, JerZees employees forcibly removed him from the bar. *Id.* 27-28. A physical altercation ensued. *Id.* at 27-32. After the employees removed him from the bar, the struggle continued. *Id.* Hanson punched at one of the employees. *Id.* Richmond Police

Officer Jason Adkins[2] and another officer were posted outside of JerZees. DE #127-3 (Adkins Dep.), at 3. Adkins observed Hanson "swing at" an individual outside the bar, and he ran over and took Hanson to the ground.[3] *Id.* at 4. Adkins arrested Hanson and placed him in the rear of his patrol car without further incident. *Id.*; DE #127-2, at 35.

After the arrest, Officer Adkins transported Hanson to MCDC. DE #127-3, at 19-22. Per his deposition testimony, Hanson has no memory of events that occurred during his initial booking at MCDC. DE #127-2, at 35-37 ("I was put in handcuffs, taken to jail, and then I remember—I remember walking out of the car, and the next thing I remember I'm in a hands and restraint chair. . . . Q: You have no independent recollection of that [booking] altercation? A: No."). The following facts of the booking process come from review of two surveillance videos depicting the booking area and the deposition testimony of the deputy jailers and two Richmond police officers present. *See* DE ##127-15, 127-16 (Conventional Filings, Video Footage from MCDC); DE ##127-3 (Adkins Dep.); 127-5 (Napier Dep.); 127-6 (Staggs Dep.); 127-7 (Whitaker Dep.); 127-10 (Gray Dep.).

Per the video and Officer Adkins, upon arrival at MCDC, Hanson and Adkins were engaged in a conversation regarding the altercation at JerZees. DE #127-15

---

[2] Hanson did not sue Officer Adkins. DE #25 (Second Amended Complaint). Officer Adkins is a party to the suit only in his capacity as a Third-Party Defendant in the Madison County Defendants' Third-Party Complaint. DE #35 (Third-Party Complaint). While Officer Adkins features centrally in the events at issue, the Court will not conduct a claims analysis and assess liability against Officer Adkins, an unsued person in the first-party complaint. *See Rizzo v. Goode*, 96 S. Ct. 598, 606 (1976) (holding that a showing of "direct responsibility" for actions on the part of the individual named in the complaint is necessary for recovery under § 1983).

[3] Hanson recalls a female officer taking him to ground. DE #127-2, at 34-35. For purposes of this motion, the identity of the officer involved in initially subduing Hanson at JerZees is immaterial.

(Hansonaudio.avr), at 1:22:43-1:23:10 (timestamp); DE #127-3, at 7. Hanson was upset regarding the circumstances of his arrest. *Id.* Deputy jailers removed Hanson's handcuffs and began asking for his personal identifying information. *Id.* at 1:23:11-1:24:19. In the process of emptying his pockets, Hanson abruptly stopped and began asking how to press charges against an individual at the bar whom he alleged assaulted him. *Id.* at 1:24:28-1:25:20. As Officer Adkins explained the process for pressing charges, Hanson became upset, profanely accused Adkins of not doing his job, and stated he wanted to press charges right then. *Id.* Hanson sarcastically asked if Adkins "wanted him to call 911" and if "he needed to call the police." *Id.* at 1:25:21-1:25:28. Apparently not pleased with how the conversation was proceeding, Hanson began to drop or slam his personal items on the booking table and continued using profanity. *Id.* at 1:25:29-1:25:38. A deputy jailer directed him to "drop the f**king attitude alright." *Id.* at 1:25:39-1:25:45.[4] Hanson responded, "I ain't dropping no f**king attitude," and made a sharp quarter turn toward Deputy Brian Staggs, who had been standing behind Hanson. *Id.*

As Hanson turned, the video shows Deputy Staggs apply hands-on force to Hanson in an apparent attempt to restrain him. *Id.* at 1:25:44-1:25:46; DE #127-16 (HANSON.avi[5]), at 1:24:54-1:24:56.[6] Staggs moves toward Hanson and pushes and/or grabs Hanson around the upper chest and neck. DE #127-16, at 1:24:54-1:24:56. Hanson

---

[4] In their deposition testimony, both Deputy Jailer Staggs and Whitaker claim they personally told Hanson to calm down or drop the attitude. DE ##127-6 (Staggs Dep.), at 2; 127-7 (Whitaker Dep.) at 5. The exact identity of the deputy who made the statement is immaterial to the motion, though Hanson seemed to turn toward the speaker.

[5] This second video feed does not have audio but more fully captures a visual of the altercation.

[6] The timestamp that appears at the bottom of this video recording does not line up with the timestamp present in DE #127-15. For example, "Hansonaudio.avr" denotes Deputy Staggs's initiation of force as occurring at 1:25:44 while "HANSON.avi" timestamps the initiation as occurring at 1:24:54, for a 50 second discrepancy.

immediately pushes Staggs off or back. *Id.* Deputies Timothy Whitaker and Josh Napier

then move to assist Staggs in restraining Hanson. *Id.* at 1:24:56-1:25:34; DE #127-7

(Whitaker Dep.), at 4; DE #127-5 (Napier Dep.) at 2-3. Hanson continued to struggle

with the deputies, and he and the deputies moved through a door into the breath alcohol

testing room. *Id.*; DE #127-10 (Gray Dep.), at 3-4. Richmond Police Officer Alfred Gray[7]

was in the room processing another arrestee and moved to assist the deputies in securing

Hanson. DE #127-10, at 3-4. Gray and the deputies returned Hanson to the booking area.

DE #127-16, at 1:25:01-1:25-34. Gray restrained Hanson's left arm in the air over

Hanson's head; Staggs secured his right arm, and Whitaker had his hands placed around

Hanson's neck and head. *Id.* The video shows Hanson continue to strain against the

deputies and officers until he soon is placed in a restraint chair. *Id.* A deputy can be heard

stating "stop resisting, man, stop" off-camera on the video with audio feed. DE #127-15,

at 1:26:28-1:26:30. Hanson was secured in the chair within two minutes of the Staggs

contact. DE #127-16, at 1:24:54-1:26:51.

Once secured in the restraint chair, Hanson continued to be verbally combative

with the deputy jailers. DE #127-15, at 1:26:30-1:29:26 (shouting at the jailers, "wanna

punch me in the face real quick" and "wanna choke me out real quick"). Eventually,

Lieutenant Deputy Jailer Dena Bell completed the intake process with Hanson in the

restraint chair. *Id.* at 1:29:30-1:41:19. During the process, Hanson continued to use

profanity and express his displeasure over his arrest. *Id.* (At one point, Hanson states, "I

might be disorderly, but I'm disorderly for a f**king reason."). Hanson continued to be

---

[7] As with Officer Adkins, Hanson did not sue Officer Gray. *See* DE #25 (Second
Amended Complaint). The Court thus does not conduct a claims analysis with respect to
Gray, who faces no accusations. *See supra* note 2.

disruptive, and the deputies moved him in the restraint chair to the property room so he could be monitored on video. *Id.* at 1:42:00-1:45:46; DE #127-5 (Napier Dep.) at 5. Hanson remained in the restraint chair for approximately three hours. *See* DE #127-13 (MCDC Daily Shift Log). During his time in the restraint chair, Hanson remained verbally combative with deputies. S*ee* DE #127-14 (Rawlins Dep.), at 3. On multiple occasions, Hanson moved around in the chair, knocking over bags hanging in the property room and being generally disruptive. *See* DE #127-7 (Whitaker Dep.), at 8. Hanson later testified that he repeatedly asked to use the restroom during the three hours of restraint. DE #127-2, at 44. He claims that deputies refused to let him out of the restraint chair, causing him to urinate on himself. *Id.* at 45.

At 4:24 a.m., having previously moved Hanson from the property room to a cell, deputies removed him from the restraint chair. *See* DE #127-13. Once out of the restraint chair, Hanson began striking the door to his cell with his fists. DE #127-7 (Whitaker Dep.), at 9. According to Deputy Whitaker, Hanson was striking the door with great enough force that Whitaker was concerned Hanson might break his hands. *Id.* Whitaker opened the cell door and instructed Hanson to stop hitting the door. *Id.* at 8; *see also* DE #127-17 (Conventional Filing – hanson.avi), at 2:34:49-2:36:00.[8] According to Whitaker, when he went to close the cell door, Hanson pushed back against the door to prevent it closing. DE #127-7, at 8-9. Whitaker states he warned Hanson several times to refrain from pushing on the door. *Id.* at 10. When Hanson failed to comply, Whitaker utilized pepper spray to subdue Hanson and successfully closed the door. *Id.* Video of the

---

[8] This third video file "hanson.avi" (DE #127-17) does not contain timestamp information; all times refer to time elapsed in the video file. It presents the same camera angle as "HANSON.avi," DE #127-16, but covers a later time period; the file contains no sound.

incident shows Whitaker opening the cell door and moments later attempting to close the door. DE #127-17, at 2:34:49-2:36:00. Hanson (the cell occupant) can be seen pushing back on the door. *Id.* Whitaker eventually succeeds in closing the door; he can be seen holstering what appears to be a pepper spray canister as he walks away from the cell. *Id.*

For his part, Hanson testified during his deposition that he has no recollection of the events leading up to or prompting Whitaker's use of pepper spray. DE #127-2, at 47-48. According to Hanson, he awoke when deputies placed smelling salts in his face. *Id.* at 50. He stated, "As soon as my eyes opened the first thing I hear is, he's a tough one, and they're standing over me and just pepper-spraying me in the face." *Id.* Per Hanson, this pepper spray use was the first and only time deputies used pepper spray against him. *Id.*

Approximately seven minutes after Whitaker left, Deputies Whitaker, Napier, and Rawlins returned to Hanson's cell to take him to a shower cell where he could decontaminate from the spray. DE ##127-5 (Napier Dep.), at 6; 127-7 (Whitaker Dep.), at 13; 127-14 (Rawlins Dep.), at 3. According to Whitaker, Hanson claimed he was unable to walk, so Rawlins and Napier assisted Hanson to his feet and escorted him down the hallway to the shower cell. DE #127-7, at 13. The deputies placed him under the shower, turned the water on for him, and left him to wash. *Id.* The deputies returned to retrieve and wash Hanson's contaminated clothing. *Id.* at 14. According to the deputies, Hanson slung his clothes around the cell, attempted to exit the shower, and refused to return to the regular cell after deputies commanded him to return. *Id.*; DE #127-5, at 6. Hanson "fought against" the deputies, and deputies could not hold on to him because he was wet. *Id.* To gain compliance, Deputy Napier drive stun tased Hanson once in the torso for approximately two seconds. *Id.*; DE #127-5, at 12-13.

Hanson tells a markedly different story. He states that after deputies deployed the pepper spray, "I was picked up on the ground, drug behind the door to where the—where the—where they were going to decontaminate me I guess[.]" DE #127-2, at 50-51. Once in the shower cell, Hanson states, "Officer Rollins pinned my right upper arm against the wall, Officer Whitaker pinned my left arm against the wall . . . and Officer Napier started repeatedly tasing me in the chest, legs. As I was being pinned up against the wall he was tasing me." *Id.* at 51. He claims to have been tased "ten or so times." *Id.* Per Hanson, approximately 15 seconds elapsed between the pepper spray and tasing incidents and the tasing incident lasted approximately 30 total seconds. *Id.*

Video footage of this incident is limited. About seven minutes after the pepper spray application and cell door closure, two deputies open the door to Hanson's cell. DE #127-17, at 2:42:00-2:43:30. The two deputies attempt to get Hanson on his feet. *Id.* Hanson resists. *Id.* A third deputy approaches to assist, and the three deputies lift Hanson off the floor of the cell. *Id.* The deputies forcibly walk Hanson a short distance to a second cell and two of the deputies place him inside—the third deputy never disappears from camera view. *Id.* at 2:43:30-2:43:45. The deputies exit the cell approximately 15 seconds after placing Hanson inside and close the door. *Id.*

The deputies return approximately six minutes later. *Id.* at 2:49:29-2:51:02. Two deputies enter the cell while the third remains within camera view. *Id.* Per the video, approximately 90 seconds later, the deputies exit the cell and attempt to shut the cell door. *Id.* at 2:51:03-2:51:15. As the deputies attempt to shut the door, the door pushes back from inside the cell. *Id.* Two deputies then enter the cell. *Id.* at 2:51:15-2:53:19. Almost two minutes later, the deputies exit, close the door, and leave the area. *Id.*

Following the taser incident, Hanson testified that he remained in the latter holding cell until approximately 11:30 a.m. or noon on February 24.[9] DE #127-2, at 56. He testified to no further altercations with MCDC staff during the remainder of his stay.

As a result of his detention at MCDC, Hanson filed the instant action. He raises seven claims: (1) § 1983 / excessive force; (2) negligence; (3) negligence per se under KRS § 71.020, et seq.; (4) negligent supervision / hiring / training; (5) assault and battery; (6) negligent infliction of emotional distress; and (7) intentional infliction of emotional distress. Following a period of discovery, the Madison County Defendants filed for summary judgment on all claims. DE #127. Plaintiff responded in opposition regarding: (1) the excessive force claims against Deputies Staggs, Whitaker, and Napier; (2) negligent supervision / hiring / training claims; and (3) negligence per se claims. DE #140. The Madison County Defendants replied. DE #150. Plaintiff filed a cross-motion for summary judgment on his claims for: (1) negligent supervision / hiring / training; (2) Deputies Staggs's and Whitaker's alleged use of excessive force; and (3) MCDC's liability relating to Staggs's and Whitaker's actions evidently under a *respondeat superior* theory.[10] DE #130. The Madison County Defendants responded. DE #138. Plaintiff did not reply. The matters are ripe for decision.

---

[9] Nothing in the record suggests Hanson left the second (shower) cell prior to checkout. The video record, which ends well before Hanson's release, does not show Hanson move from the shower cell following the taser event. *See* DE #127-17, at 2:53:19-3:58:46 (end of video).

[10] Plaintiff's briefing leaves much to be desired. Throughout his memorandum seeking summary judgment, Plaintiff cites to documents that he neither attaches nor locates elsewhere in the court record—*e.g.*, the personnel file of Deputy Craig Whitaker. *See* DE #130-1, at 2 (citing "Whitaker File," but not attaching it). Plaintiff further cites to portions of deposition testimony not filed by him and included in the record. Equally unhelpful is the general paucity of referenced legal authority cited.

## II.      Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106 S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). The Rule "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552.

If the movant bears the burden of persuasion at trial, "that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Id.* at 2556 (citation omitted) (Brennan, J., dissenting); *see also Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (noting that, when the movant also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it") (citation and internal quotation marks omitted). "If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp.*, 106 S. Ct. at 2557 (Brennan, J., dissenting) (emphasis in original).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such

11

evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*,

187 F. App'x 428, 444-45 (6th Cir. 2006).

**III.   Analysis**

    *A.   Section 1983 Claims*

    Section 1983 does not create substantive rights but, rather, "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States. . . ." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924 (1982); *Mertik v. Blalock,* 983 F.2d 1353, 1359 (6th Cir.1993). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989) (additional citations omitted)).

*Estate of Goodin v. Knox Cty., Ky.*, Civil No. 12-18-GFVT, 2014 WL 2719816, at *6

(E.D. Ky. June 16, 2014). Plaintiff's excessive force claims against the various Madison

County Defendants proceed, properly analyzed, under the Fourth Amendment.[11]

---

[11] Courts analyze claims of excessive force under one of the Fourth, Eighth, or Fourteenth Amendments, depending on the legal status of the target at the time of the alleged use of force. *Gravely v. Madden*, 142 F.3d 345, 348-49 (6th Cir. 1998). Courts apply the Fourth Amendment's analysis to free citizens, the Eighth's to convicted persons, and the Fourteenth's (*i.e.*, its due process component) to pretrial detainees. *Id.* In the Second Amended Complaint, Hanson asserts the § 1983 claim under the Eighth and Fourteenth Amendments. Defendants begin their summary judgment analysis by referring to Plaintiff as a pretrial detainee and referencing the Fourteenth Amendment standard, prior to applying the Fourth Amendment "objective reasonableness" test to Defendants' conduct. DE #127-1, at 12; *see also* DE #140 (Reply), at 2 n.2. Ultimately, "Fourth Amendment protections extend through police booking until the completion of a probable cause hearing. *Coley v. Lucas Cnty, Ohio*, 799 F.3d 530, 537 (6th Cir. 2015) (citing *Aldini v. Johnson*, 609 F.3d 858, 866-67 (6th Cir. 2010) ("[T]he probable-cause hearing is a judicial proceeding that affects the 'legal status' of the arrestee [for those arrested without a warrant], constitutionally authorizing his detention for the duration of his sentence. Consistency with our pronouncement that 'the legal status of the [plaintiff] determines [which a]mendment governs his excessive force claims' requires extending the Fourth Amendment's protections until this change in legal status occurs." (citations omitted))). Hanson's detention at MCDC, and therefore, the conduct at issue in this case, occurred

Hanson has sued the jailer and deputy jailer defendants in both their individual and official capacities. As further explored below, different standards apply to these defendants depending on the capacity involved. *See Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 834-35 (E.D. Tenn. 2011). Additionally, in the § 1983 context, "[e]ach defendant's liability must be assessed individually, based on his or her own actions." *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008). The Court will analyze each § 1983 Defendant in turn.

1. Individual Capacity Claims

As to each defendant's individual capacity claims, the Madison County Defendants raise the defense of qualified immunity. DE #127-1, at 11. When an official sued under § 1983 raises this defense:

> [T]he government official is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established.

*D.D. v. Scheeler*, 645 F. App'x 418, 424 (6th Cir. 2016) (citations and quotation marks omitted). Significantly, "[a] plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense." *DiLuzio v. Village of Yorkville,* 796 F.3d 604, 608-09 (6th Cir. 2015). This requires that "the plaintiff must, at a minimum, offer sufficient evidence to create a genuine issue of fact, that is, evidence on which a jury could reasonably find for the plaintiff." *Id.* (citations and quotation marks omitted). Ultimately, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [officer] conduct. The doctrine protects all but the plainly incompetent or those who knowingly

---

prior to any probable cause hearing pertaining to Hanson's arrest. As such, the Fourth Amendment governs Hanson's § 1983 claims.

violate the law." *Dorsey*, 517 F.3d at 394 (citations and internal quotation marks omitted) (quoting *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006).

Under the qualified immunity analysis, the Court must generally view the facts in the "light most favorable to the plaintiff." *Scheeler*, 645 F. App'x at 424. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007); *see also Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) ("While the facts are normally taken as alleged by the plaintiff, facts that absolutely contradict the record will not be considered as claimed by the plaintiff."). When video evidence depicts events at issue, a court "must 'view [] the facts in the light depicted by the videotape,' which is all that the summary judgment standard demands." *Witham v. Intown Suites Louisville Ne., LLC*, 815 F.3d 260, 265 (6th Cir. 2016) (quoting *Scott*, 127 S. Ct. at 1776); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015).

Substantively, the Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures." *Graham v. Connor*, 109 S. Ct. 1865, 1871 (1989). The use of "excessive force" during an arrest "is unreasonable and thus violates the Fourth Amendment." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Graham*). The Sixth Circuit has succinctly stated the contours of the legal framework for Fourth Amendment excessive force claims:

> Whether an officer's use of force in effecting an arrest violates the Fourth Amendment is a question of whether his actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. . . . The test is reasonableness at the moment force is used, judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The court

14

must carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . . Three factors guide this balancing: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . . Though important, these factors are not the end of the matter, as the court ultimately must determine whether the totality of the circumstances justifies a particular sort of seizure.

*Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *Graham* factors) (quotation marks omitted).

Courts apply the same Fourth Amendment objective reasonableness standard for a detainee, arrested without a warrant, from his transfer from the arresting officer's custody until the detainee's probable cause hearing. *See Aldini*, 609 F.3d at 865-67; *see also Laury v. Rodriguez*, — F. App'x —, 2016 WL 4473242, at *4 (6th Cir. Aug. 25, 2016) (citing *Coley* and *Aldani* in identifying Fourth Amendment as the standard that applies to a pre-probable cause hearing detainee and analyzing the claim using the *Graham* factors); *cf. Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (applying similar objective standard to pretrial detainee's excessive force claim and considering the following list of factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.").

The Second Amended Complaint asserts a blanket § 1983 claim against all Madison County Defendants for their use of excessive force in "expos[ing] Plaintiff to an unreasonable, substantial, and excessive risk of serious harm." DE #25, ¶¶ 53-57. On this record, Plaintiff has failed to offer sufficient evidence to overcome each Defendant's

15

qualified immunity defense. The Court has evaluated all materials in the record, as presented and argued by the parties.

### a.   Jailer Doug Thomas

Plaintiff does not allege that Jailer Thomas was directly involved in any unconstitutional (or other) conduct on the date in question. Instead, Plaintiff relies on a supervisory theory of liability. Defendants move for summary judgment premised on Jailer Thomas's qualified immunity. Plaintiff did not respond to the assertion of qualified immunity as to Jailer Thomas.

"Section 1983 liability must be premised on more than mere respondeat superior, the right to control one's employees." *Everson*, 556 F.3d at 495 (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Supervisory liability will not stand "unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* Ultimately, "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act." *Shehee*, 199 F.3d at 300 (internal quotation marks omitted).

Plaintiff has not presented any facts to support imposing individual liability against Jailer Thomas. Thomas was not present during the time period at issue. As Defendants convincingly argue, not being on site at the time of the alleged conduct, Thomas cannot have directly participated in any alleged misconduct. Aside from allegations related to a failure to train and/or supervise, *see infra* Section III.A.2.b, Plaintiff has not addressed any specific act of Thomas that demonstrates he "implicitly

authorized, approved, or knowingly acquiesced" as to any deputy jailers' particular conduct. Accordingly, Plaintiff has not offered sufficient evidence to overcome Thomas's qualified immunity for any excessive force claim.

### b. Lieutenant Dena Bell

Similarly, Hanson fails to allege any particular misconduct on the part of Lieutenant Bell. He further does not dispute Defendants' assertion of qualified immunity with respect to Bell, having failed to respond in any way to the argument. Simply put, Hanson does not present any evidence that Bell used *any* amount of force against him during his stay at MCDC. Per video, Bell's only apparent physical contact involved securing one of Hanson's feet in the restraint chair after other deputy jailers subdued him. DE #127-16, at 1:26:30-1:27:30. Accordingly, any claim for excessive force against Lieutenant Bell must be dismissed. Hanson simply does not offer any, much less sufficient, evidence to maintain an excessive force claim against Bell.

### c. Deputy Brian Staggs

Hanson alleges Deputy Staggs used excessive force during the initial booking process at MCDC. DE #25, ¶ 13. Specifically, Hanson asserts Staggs "grabbed Plaintiff by the throat/neck, choking him, and forcing him backwards, causing Plaintiff's body and head to hit the wall. Plaintiff did not threaten or act in a combative manner towards Defendant Staggs nor anyone else standing by during the booking process." *Id.* Again, Defendant asserts the qualified immunity defense. Plaintiff nominally responded, DE #140, at 1-4, and indeed argues he is entitled to summary judgment as to Staggs's use of force. DE #130-1, at 9-11.

Plaintiff has no first-hand memory of Staggs's alleged use of excessive force. DE #127-2, at 35-37. The Court construes the material facts related to Staggs's use of force "in the light depicted by the videotape." *Intown Suites*, 815 F.3d at 265. On this record, and in view of the video and audio recordings, Plaintiff resisted compliance with verbal instruction from the deputy jailers, directed aggressive language at the deputy jailers, and the deputy jailers, including Staggs, reasonably perceived him as a danger given his erratic and verbally confrontational behavior. The following facts are undisputed, per the video surveillance: (a) Hanson profanely argued with deputy jailers and the arresting officer during the booking process; (b) Hanson refused to cooperate and answer basic intake questions, instead demanding to press charges against the individual he alleged struck him at JerZees; (c) Hanson repeatedly directed obscenities at the deputy jailers; (d) Hanson sharply changed the encounter tone and began slamming items on the intake table; (e) in response to the request to "drop the f**king attitude," Hanson replied "I ain't dropping no f**king attitude" and abruptly turned to face Deputy Staggs[12]; (f) Staggs pushed/grabbed Hanson by the neck/upper chest for approximately 2-3 seconds; (g) Hanson resisted and pushed back at the deputy jailer's attempts to restrain him after Staggs's initial use of hands; (h) he continued to resist until placed in the restraint chair.

Considering the *Graham* factors from above, and viewed through the qualified immunity prism, Deputy Staggs was justified in the limited level of initial force used.

---

[12] Regarding Hanson's turn toward Staggs, Defendants consistently characterize Hanson as taking a "combative or aggressive stance." DE #127-1, at 15; *see also* DE ##127-6 (Staggs Dep.), at 3; 127-7 (Whitaker Dep.), at 7. The Court also notes, as to video perception, that the KSP trooper saw Hanson as "blading his body," DE #127-8 (Hamm Dep.), at 4, and the FBI agent saw Hanson as "bowing" his body. DE #127-9 (Mugnier Dep.), at 4. He undoubtedly turned sharply toward Staggs, at close proximity, in a physical act directly coupled with profane refusal to comply with officers' directions.

Given Hanson's verbal aggression, noncompliance with deputy jailer commands, and erratic behavior, Staggs reasonably perceived Hanson as a threat when Hanson turned to face him. Most importantly, Hanson resisted deputy jailer attempts to maintain order. He refused to comply in the booking process. He angrily slammed his personal items down on the intake table in processing. He responded to requests to calm down by verbally escalating the situation. Given the lack of compliance, Staggs was justified in applying the brief initial use of hands-on force. *See, e.g.*, *Rudlaff*, 791 F.3d at 642 ("Because Carpenter actively resisted arrest [via verbal defiance, puffing up his chest, locking body, and staring down police] and refused to be handcuffed, a reasonable jury applying the law of our circuit could conclude only that the officers were constitutionally able to use the force they did [taser and knee strike] to subdue him.").

In his response, Hanson takes issue with Staggs's application of force prior to any physical resistance on Hanson's part. However, Staggs did not need to wait for physical resistance prior to utilizing some level of force. *See Rudlaff*, 791 F.3d at 641 (active resistance justifying use of force includes "disobeying officers"). Further, the Court must refrain from judging Staggs's actions "with the 20/20 vision of hindsight." It is easy to second guess use of force after the fact. When viewed from "the perspective of a reasonable officer on the scene," Hanson's actions justified Staggs's minimal use of force. A jury would see a belligerent detainee bent on opposing officer direction. Hanson, by all accounts intoxicated and present based on being disorderly, confronted in some way each person he encountered. As Hanson continued to focus on his own complaints, he became increasingly more agitated. When finally, directly, and emphatically told to calm down, he reacted contra, but with like emphasis. To this he added a sharp quarter

19

turn toward a nearby officer, which that jailer (and others) reasonably took as threatening, something no reasonable jury would, in context, question. Hanson immediately fought back, which further validates Staggs's initial perception of the need to gain control. Any evaluation requires proper deference to the situational assessment by correctional staff.

Though Hanson has the burden, he nowhere discusses or expounds the *Graham* factors. *See Graham*, 109 S. Ct. at 1872 ("the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"). The Court applies these factors in a non-mechanical way, giving due consideration to the context and due deference to the institutional concerns presented. Here, Staggs briefly used minimal physical force to gain control of an escalating problem. The force was brief and ended, as to all officers, upon attainment of control. Hanson's behavior prior to the use of force was erratic and objectively indicative of a potential safety concern. Per *Graham*'s factors and with required deference, the Court sees no issue of constitutional doubt here.[13]

---

[13] Interestingly in *Ayala–Rosales v. Teal*, 659 F. App'x 316, 319-22 (6th Cir. 2016), the Sixth Circuit applied *Kingsley*, in a like booking context, embracing Fourteenth and rejecting Fourth Amendment application. The detainee in *Ayala-Rosales* had only been arrested and taken to jail, and the Court applied *Kingsley*, noting its clarification, building on *Graham*, that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S.Ct. at 2473; *Ayala-Rosales*, 659 F. App'x at 319. As *Ayala-Rosales* states, under the *Kingsley* and *Graham* rubric, a reviewing court must apply the recognized force factors non-mechanically and with appropriate deference to the institutional security and order needs as articulated by the state in the concrete context presented. The question, at bottom and viewed through that prism, remains "'whether the use of force could plausibly have been thought necessary.'" *Ayala-Rosales*, 659 F. App'x at 321 (harmonizing query pre- and post-*Kingsley* and citing *Griffin v. Hardrick*, 604 F.3d 949 (6th Cir. 2010), which quotes *Whitley v. Albers*, 106 S. Ct. 1078, 1085 (1986)). *Kingsley,* as applied by *Ayala-Rosales*, perhaps signals that the analytical line between Fourth and Fourteenth Amendment analyses, as to force and pre-trial detention, now stands erased (or at least, the tests now

Even if Staggs's use of force was excessive under the Fourth Amendment's objective reasonableness standard, Plaintiff has not shown that Staggs violated clearly established law. The Court must avoid "a high level of generality" in assessing the clarity of the right or misconduct. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*) ("The dispositive question is whether the violative nature of particular conduct is clearly established. . . . This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal quotation marks omitted) (citing *Brosseau v. Haugen*, 125 S. Ct. 596 (2004))). Plaintiff does not cite any law clearly establishing that a brief (2-3 seconds) use of hands-on force against a verbally noncompliant arrestee, under these circumstances, is excessive. Further, according to MCDC's Policy and Procedures Manual, deputies are allowed to use hands on force, including pressure points, as part of the "Force Continuum" if verbal commands are unsuccessful in preventing or stopping a detainee disturbance or for protecting oneself from personal harm. DE #127-25 (Policy and Procedure Manual), at 60-61. A reasonable deputy in Staggs's position "would not necessarily have known that it might be unlawful for him to use" hands-on force on a plaintiff actively disobeying direct orders in a situation of this type. *See Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).

Plaintiff addresses Staggs's qualified immunity in only the most conclusory manner, stating: "Deputy Staggs . . . does not have immunity for his actions. This was not a 'close call' as Defendants allege, rather it is patently clear that Deputy Staggs violated multiple policies when he used excessive force unreasonably against the Plaintiff." DE #140, at 4. Plaintiff primarily argues that Deputy Staggs's use of force was

---

are indistinguishable). In this context, no rational jury could reject the plausibility of the force decisions, thus insulating them as a basis for liability.

unconstitutional for two reasons: (1) the use of a "chokehold" and failure to use verbal

de-escalation violated MCDC, state, and national use of force guidelines, and (2) at the

time of the incident, Staggs had not received training in the use of force, and therefore,

his use of force was presumptively unreasonable. DE ##130-1, at 10-11 ("Officer Brian

Staggs employed hands-on physical force to Plaintiff after not having received any

training whatsoever."); 140, at 4 ("These actions are completely unreasonable and violate

MCDC policies, Kentucky state policies, and national standards.").

    To establish Staggs's conduct as excessive force, Hanson relies primarily on the

expert opinion testimony of Eugene Miller.[14] DE #140, at 1-3. He further cites various,

largely general, MCDC, Kentucky state jail standards, and ACA Jail National Standards

and claims Staggs's use of the brief chokehold violated said standards. *Id.* Miller opines

that Staggs's "unnecessarily used force on Mr. Hanson," causing the rest of the

"untoward staff action" to take place. DE #126-3 (Miller Dep.), at 103-04. Miller's

testimony relies on his interpretation of the incident video in light of the general jail

standards cited. *Id.* at 95-105. However, Hanson did not attach or file in the record any of

the referenced standards. Without the standards relied on by Miller, the Court cannot

effectively evaluate Miller's opinion or review the incident video with the benefit of the

standards. The Court can only consider the record before it. Without the requisite factual

basis, Plaintiff's arguments are difficult to process.

    Nevertheless, even if Plaintiff had attached the applicable materials, he does not

reference any proper cases or legal standards to support the predicate conclusion that

---

[14] Hanson did not attach the relevant portion of Miller's deposition testimony, *see id.* at 1
(referencing Miller deposition as "Exhibit 1," but attaching no exhibit). However,
Defendants did attach the entire Miller deposition to DE #126. Accordingly, the Court
considers the deposition part of the overall record.

Staggs's failure to adhere to generalized rules of engagement would govern the reasonableness of his actions under the Fourth Amendment and § 1983. The Court does not analyze Staggs's actions in a vacuum—the inquiry is whether his actions were "objectively reasonable in light of the facts and circumstances confronting [him]." *Graham*, 109 S. Ct. at 1872. The analysis is case and fact specific; judging Staggs's conduct against broad standards[15] divorced from context is precisely the type of hindsight review courts must avoid.

Further, to the extent Hanson relies on Staggs's lack of training in use of force, that assertion is not supported on this record. During his deposition testimony, Staggs, as to sequence, stated he did not recall if he had completed his initial yearly in-service training prior to Hanson's detention at MCDC. DE #138-3 (Staggs Dep.), at 3-4. In Defendants' response to Hanson's motion for summary judgment, Defendants tendered an affidavit from Staggs, with exhibits, verifying that he indeed did receive his in-service training in November 2012. DE #138-13 (Staggs Affidavit). Said training included instruction regarding the proper use of force. *Id.* Staggs's inability to recall the exact timing of his training during deposition testimony does not create a genuine issue of fact regarding a lack of training in light of the affidavit and exhibits. Accordingly, Plaintiff cannot support his argument that Staggs was untrained in the use of force.[16]

For the reasons stated, Deputy Staggs is entitled to qualified immunity and judgment as a matter of law.[17]

---

[15] Hanson does not attempt to draw an effective factual or legal link between training and the Constitution.

[16] Again, however, Plaintiff further fails to cite any supporting legal principle.

[17] Of course, Hanson's failure to overcome Staggs's assertion of qualified immunity likewise precludes a grant of summary judgment in his favor.

d.  Deputies Craig Whitaker, Jason Rawlins, and Josh Napier

i.  *Use of hands-on force during initial booking*

Hanson alleges that Deputies Whitaker, Napier, and Rawlins used excessive force when they joined Staggs in attempting to restrain Plaintiff after Staggs's initial use of force. DE #25, ¶ 14. Specifically, "Whitaker forcefully choked Plaintiff for an extended period of time, despite Plaintiff's being restrained and not fighting back or resisting, causing Plaintiff's face to change colors as he was deprived of oxygen." *Id.* "Plaintiff was thereafter forced into a restraint chair by . . . Defendants Whitaker, Napier, Rawlins, Bell and/or Staggs, and Plaintiff was kept there for a period of time, and was moved to various locations within [MCDC]. *Id.* ¶ 15.

Again, Plaintiff has no personal recollection of booking events. DE #127-2, at 35-37. Per the tendered video, after Staggs's initial use of force, Deputies Whitaker and Napier, as well as Richmond Police Officer Gray, moved to assist Staggs in restraining Hanson.[18] DE #127-16, at 1:24:56-1:25-34; DE #127-7, at 4; DE #127-5, at 2-3. The deputies secure Hanson approximately 30-45 seconds after the initial attempt at restraint. *Id.* The following facts are undisputed, per the video surveillance: (a) Hanson pushed Deputy Staggs; (b) Whitaker, Napier, and Officer Gray restrained Hanson—Whitaker had his hands around Hanson's neck and head and Napier and Gray secured his right and left arms, respectively; (c) Hanson continued to strain against the deputies until they secure him in the restraint chair—Hanson never went limp or acquiesced to the force used and he declared, indeed, that he "will not stop" resisting, DE #127-15, at 1:26:26-1:26:49;

---

[18] Deputy Rawlins did not become involved with Hanson until after he was secured in the restraint chair. DE #127-14 (Rawlins Dep.), at 2. Hanson makes no direct allegation as to Rawlins in this phase.

(d) once secured in the restraint chair, the deputies stopped applying hands-on force; (e) Hanson continued to be verbally defiant even after secured in the restraint chair.

For this distinct period, applying the *Graham* factors, the deputies' were clearly justified, and not excessive, in the level of force used and, therefore, entitled to qualified immunity. Given Hanson's use of force against Staggs, and the contemporaneous events, Deputies Whitaker and Napier reasonably perceived Hanson as a threat. The deputies' responsive use of force was a reasonable attempt to protect Staggs and restore order. That Gray, tending to the other, unrelated arrestee, felt the need to intercede further validates this. Additionally, Hanson actively resisted the deputies' attempts to restrain him. The video evidence clearly shows Hanson refusing to submit to the deputies prior to being placed in the restraint chair. Hanson's body remains rigid during the entire application of force by Whitaker and Napier. Hanson's active resistance justifies this use of force. *See Rudlaff*, 791 F.3d at 642. No rational jury could find otherwise, with the required contextual assessment.

Most importantly, especially with regard to Whitaker's apparent use of a two-handed chokehold, the video shows that the deputies, including Whitaker, stopped applying force immediately when Hanson was successfully restrained. *See Coley*, 799 F.3d at 541 ("Chokeholds are objectively unreasonable where an individual is already restrained or there is no danger to others."); *Marshall v. West*, 559 F. Supp. 2d 1224, 1243 (M.D. Ala. 2008) ("[T]he court finds that a reasonable officer would have had 'fair warning' that employing a suffocating 'chokehold' on a handcuffed and detained suspect who did not pose a threat to the officer's safety or a flight risk was unconstitutional."); *cf. Rudlaff*, 791 F.3d at 642 (regarding force dichotomy involving taser use: "When a

25

suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot."); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509-10 (6th Cir. 2012) (collecting cases and illustrating resisting/non-resisting dichotomy). Whitaker and Napier stopped applying force once Hanson was restrained; therefore, in light of his resistance, their use of force was contextually reasonable. Plaintiff's excessive force claim fails.[19]

### ii.    Use of pepper spray[20]

With respect to Whitaker's use of pepper spray, again, the video record captures a significant portion of the incident. DE #127-17, at 2:34:49-2:36:00. Hanson has no recollection of the events precipitating Whitaker's use of the pepper spray. DE #127-2, at 47-48. Per the Second Amended Complaint, Hanson allegedly awoke on the floor of a jail cell and one or more of Deputies Whitaker and/or Napier "sprayed pepper-spray into Plaintiff's face, including his eyes and mouth, despite the fact that Plaintiff was not resisting or being physically threatening or combative." DE #25, ¶ 16. Per his actual deposition testimony, Hanson awoke when deputies placed smelling salts in his face. DE #127-2, at 50. "As soon as my eyes opened the first thing I hear is, he's a tough one, and they're standing over me and just pepper-spraying me in the face." *Id.*

Defendant Whitaker disputes Plaintiff's version of these events. Per Deputy Whitaker, once removed from the restraint chair, Hanson began and continued striking

---

[19] Neither side discusses separately the restraint chair use as a claim. Plaintiff does not make a separate claim premised on that issue in the Second Amended Complaint (merely mentioning chair use). The Court thus presumes that Hanson does not allege that the use of the restraint chair, in this context, itself rose to a matter of constitutional inquiry. Certainly, Plaintiff does not cite any cases or in any way discuss the topic; the defense seeks judgment on all claims, and Plaintiff does not, by way of response, differentiate that segment of treatment for analysis.

[20] Plaintiff did not contest or oppose summary judgment as to this claim.

his cell door with his fists with such force that Whitaker feared he might injure himself. DE #127-7, at 9. Whitaker opened the cell door and instructed Hanson to stop punching the door. *Id.* at 8. When Whitaker attempted to close the door, Hanson pushed back to prevent it closing. *Id.* After warning Hanson repeatedly to stop, Whitaker utilized his pepper spray to achieve compliance and successfully secure the door. *Id.* at 10.

The video evidence clearly supports Defendants' version of events. Hanson visibly pushes back on the cell door when Whitaker attempts to close it. DE #127-17, at 2:34:49-2:36:00. Only when Hanson resists the door closure does the video show Whitaker move toward Hanson. *Id.* At no point in the video, during the relevant period, does Whitaker or any other deputy enter Hanson's cell. *Id.* Quite simply, no reasonable jury could credit Hanson's version of events in light of the surveillance video.

Given the facts established by the video, Whitaker's use of pepper spray was justified. *See, e.g.*, *Vaughn v. City of Lebanon*, 18 F. App'x 252, 266 (6th Cir. 2001) (citing *Adams v. Metiva*, 31 F.3d 375, 384, 386 (6th Cir. 1994) ("The use of a chemical weapon such as pepper spray is not per se unreasonable. As established in *Adams*, the analysis for use of a chemical weapon as force is essentially the same as that for the use of more traditional forms of physical control, turning upon the totality of the circumstances, including the arrestee's conduct and the officer's reasonable perception of the scenario."). Per Whitaker, and as confirmed by the video, Hanson resisted Whitaker's attempts to secure the cell door. After Hanson ignored verbal commands to stop pushing back on the cell door, Whitaker deployed pepper spray. Once compliance was achieved (*i.e.*, the door closed), Whitaker stopped applying force. As per the analysis above regarding Whitaker's use of a chokehold, Hanson's resistance justified the temporally

limited application of force to achieve compliance—here, the need to secure a detainee in a cell to prevent further disruption and eliminate any danger. Plaintiff's own expert agreed. *See* DE #126-3, at 114-115. The use of force was objectively reasonable under the Fourth Amendment.

### iii.     Use of taser

Finally, Hanson alleges Deputies Whitaker, Napier, and Rawlins used excessive force when they "dragged [him] into another room . . . pinned [him] against the wall by each arm, and two or more of the deputy jailer Defendants . . . used a taser on stunning [sic] device on Plaintiff's abdomen repeatedly, despite the fact that Plaintiff was not resisting or being physically threatening or combative." DE #25, ¶ 17.

Here, Plaintiff's and Defendants' accounts of the incident diverge significantly. According to Hanson, immediately after being sprayed with pepper spray, deputies picked him up off the ground and "dragged" him toward a shower cell for decontamination. DE #127-2, at 50-51. Once in the cell, "Officer Rollins pinned my right upper arm against the wall, Officer Whitaker pinned my left arm against the wall . . . and Officer Napier started repeatedly tasing me in the chest, legs. As I was being pinned up against the wall he was tasing me." *Id.* at 51. He claims to have been tased "ten or so times." *Id.* Per Hanson, just approximately 15 seconds allegedly elapsed between the pepper spray and tasing incidents and the tasing incident itself lasted approximately 30 seconds. *Id.*

Video footage, limited though it is as to this phase of the events, refutes Plaintiff's version and leave Defendants' testimony as the only plausible explanation of the incident. Approximately seven minutes (not as Hanson claims 15 seconds) after Whitaker

deployed the pepper spray, **two** deputies return to Hanson's cell and attempt to move Hanson to the shower cell. DE #127-17, at 2:42:00-2:43:30. Once the deputies succeed in lifting Hanson to his feet—he can be seen resisting the deputies' attempts to move him—the deputies move him a short distance down the hall to another cell. *Id.* At no point do all three deputies (Whitaker, Napier, and Rawlins) enter the shower cell with Hanson. *Id.* Additionally, Hanson's claim of not resisting is demonstrably false. Approximately six minutes after placing Hanson in the new cell, the deputies return to that cell. *Id.* at 2:49:29-2:51:02. Per the video, when the deputies exit and attempt to close the cell door, the door pushes back out from inside the cell. *Id.* After multiple attempts to close the door, two deputies enter the cell for approximately two minutes, then exit the cell and successfully close the door. *Id.* at 2:51:15-2:53:19.

The footage largely tracks (and certainly squares with) the testimony of Deputies Whitaker and Napier, who detailed Hanson's attempted exit from the shower cell and refusal to return to the cell despite multiple commands to return. *See* DE #127-7, at 13-14; DE #127-5, at 6, 12-13.

The tasing claim again calls for a contextual assessment. Hanson's version is patently unreliable compared against the video and is internally inconsistent across the case. His sequencing claim factually fails (there obviously was a significant gap—far greater than 15 seconds—between the pepper spray application and the trip to the shower). Hanson compresses within 45 seconds a series of actions that obviously spanned at least 15 and perhaps more than 20 minutes, with multiple intervening segments. His cast of characters is inaccurate—indeed, the video shows there was not a moment when the trio of Whitaker, Napier, and Rawlins were together in a cell with Hanson and could

29

have pinned him in the manner and with the roles alleged. While some period of the video shows two deputies with Hanson in the second cell (the decontamination room), Hanson's version cannot coexist with the video. The video also shows that Hanson, as he had been through the night, was resistant to commands and directions of jail staff. This had already gotten him sprayed and it later got him tased in the shower cell. Even Hanson admits that he grabbed or slapped away the taser, further indicating his continuing characteristic of opposition to the officers' efforts to maintain order. The Court also notes that Hanson's claims of being dragged and kicked, related to the pepper-spray segment, simply fail per the video, and this objective deficiency undercuts Hanson's entire version.

Of course, Hanson's versional history impacts the Court's view (as it did the FBI Agent's, who ultimately characterized Hanson as untruthful on many points). He has given wildly disparate estimates of taser frequency (initially 3, then 5, then 10) and bodily location. Because he admits to significant gaps in recollection from the night, because his recollections have been so inconsistent, and because the story he told fails to match objective portions of the video, the Court finds Hanson's tale as to the tasing wholly contradicted by the record.

The officers' version indicates, again, that they confronted an uncooperative detainee. His disorderly behavior continued once out of the restraint chair, requiring continuous attention. This included Hanson's effort to block closure of the dry-cell door, prompting OC use. Then, when jailers tried to decontaminate him, Hanson again refused to follow instructions and comply with the dictates of the staff. One tase imposed in this context (which is all the record supports), given the history and circumstances, hardly transgresses constitutional norms. The active resistance justified the deputies' taser use.

*See, e.g.*, *Rudlaff*, 791 F.3d at 642 ("Because Carpenter actively resisted arrest [via verbal

defiance, puffing up his chest, locking body, and staring down police] and refused to be

handcuffed, a reasonable jury applying the law of our circuit could conclude only that the

officers were constitutionally able to use the force they did [taser and knee strike] to

subdue him."); *Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 95-97 (6th Cir. 2012)

("Plaintiff's attempt to run away and his failure to cooperate in allowing officers to

handcuff him were sufficient to justify the use of a taser to gain Plaintiff's compliance.");

*Williams v. Sandel*, 433 F. App'x 353, 362 (6th Cir. 2011) ("But even under Williams's

version of the facts, despite the first thirty-six ECD activations, all of the baton strikes,

and the repeated pepper spray usage, Williams remained unsecured and unwilling to

comply with the officers' attempts to secure him[.] . . . As a result, his interests do not

outweigh the government's.").[21]

### 2. Official Capacity Claims

#### a. Excessive Force

"A suit against an individual 'in his official capacity' has been held to be

essentially a suit directly against the local government unit and can result in that unit's

liability to respond to the injured party for his injuries." *Leach v. Shelby County Sheriff*,

891 F.2d 1241, 1245 (6th Cir. 1989). In other words, to the extent Hanson has sued the

individual jailer defendant's in their official capacity, "it is nothing more than a suit

---

[21] Again, Hanson has the burden of defeating immunity. He points to not a single case
establishing that any act of a jail employee violated "clearly established law." This hurdle
calls for more than generalized Fourth Amendment principles—the "existing precedent
must have placed the statutory or constitutional question beyond debate." *White v. Pauly*,
580 U.S. ___, ___ (2017) (per curiam) (slip op. at 6) (citing and quoting *Mullenix v.
Luna*, 136 S. Ct. 305, 308 (2015)).  Further, the "clearly established law must be
'particularized' to the facts of the case." *Id.* Here, Hanson essentially cites no cases and
thus obviously fails this portion.

against [Madison] County itself." *Petty v. County of Franklin*, 478 F.3d 341, 349 (6th Cir. 2007).

A county or municipal government "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 98 S. Ct. 2018, 2036 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 2037-38. To the extent that Plaintiff seeks relief under a *respondeat superior* theory, *see* DE #130-1, at 13, his claim must be denied. Similarly, to the extent Hanson seeks to establish that Madison County and MCDC engaged in a common or repetitive practice that might establish a custom or policy of using excessive force against detainees, he fails to put forth any competent proof. Plaintiff, offering no proof outside of this case, identifies no widespread practice "hav[ing] the force of law" such that Madison County might be liable for those employees following said practice. *See Bd. Of Cnty. Comm'r v. Brown*, 117 S. Ct. 1382, 1388 (1997). Accordingly, (and *a fortiori*, given the merits analysis) Hanson has not established a § 1983 claim for excessive force against Madison County. To the extent Hanson pursues a § 1983 failure to train and/or supervise claim, the Court addresses those allegation below.

### b. Failure to Train / Supervise

Hanson also alleges that Madison County and MCDC "were negligent in their hiring, training and supervision of the jailer, Defendant Doug Thomas, and all these Defendants were negligent in their hiring, training and supervision of deputy jailer

Defendants." DE #25, ¶ 48. Further, Madison County, MCDC, and Jailer Thomas "were negligent in their supervision of deputy jailer Defendants[, who] were also negligent in supervision of each other." *Id.* ¶ 47.

To establish an alleged failure to train claim, Hanson must show that "the failure to train amounts to deliberate indifference to the rights of persons with whom the [jailers] come into contact." *City of Canton v. Harris*, 109 S. Ct. 1197, 1204 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 1205. "[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 1206. Put another way, "[t]o succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Plaintiff advances several arguments in support of his failure to train and/or supervise claims, namely: (1) deputy jailers receive no formal training outside the yearly 16 hours of in-service training; (2) supplementary "hands-on" shadowing training generically violates national standards, state Administrative Regulations, and MCDC's own use of force policies; (3) deputy jailers receive no training related to hands-on uses of force; (4) deputy jailers engage in horseplay; (5) deputy jailers consistently verbally abuse detainees; and (6) Lieutenant Bell "had never in all of her years of service written a

deputy jailer up for violating MCDC policy." DE ##130-1, at 7-9; 140, at 7. Unfortunately, while Plaintiff cites to certain regulations and portions of deposition transcripts, he again failed to actually file the documents in the Court record. This failure leaves the Court to assess what amount to bare assertions.

A claim of this nature requires allegations and proof of: "(i) a 'clear and persistent pattern' of unconstitutional conduct; (ii) the municipality's 'notice or constructive notice' of that conduct; (iii) its 'tacit approval' of the conduct; and (iv) that the policy of the inaction was the 'moving force' behind the constitutional deprivation." *Mitchell v. Mike*, No. 5:14-301-DCR, 2015 WL 6675549, at *6 (E.D. Ky. Oct. 30, 2015) (quoting *Doe v. Clairborne Cnty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996). Here, Plaintiff essentially relies only on the conclusions and assessments of its expert. However, the Court requires proof in the record, in the summary judgment context, and Plaintiff's thin arguments in no way address each of the requisite claim elements.

Of course, most fundamentally, the Court has found no supportable underlying violation, which eliminates any municipal claim tied to and requiring such a predicate wrong. *Shadrick v. Southern Health Partners, Inc.*, No. 4:11CV-00033-JHM, 2016 WL 4555611, at *20–21 (W.D. Ky. Aug. 31, 2016) (cataloging cases for principle requiring underlying violation to support failure to train theory).

Turning to the three-part *Ellis* inquiry, Plaintiff has not shown that the training or supervision received was inadequate. MCDC deputy jailers attended the state-mandated 16 hours (circa 2013) annual in-service training, which includes use of force instruction. *See* 501 KAR 3:160(4) (2011) (amended March 4, 2016, to require 24 hours of training); DE #127-7 (Whitaker Dep.), at 12-13; DE #138-13 (Staggs Affidavit). Plaintiff points to

34

no record evidence that the Commonwealth's required in-service training, and MCDC's policy of complying with said training requirement, amounts to inadequate training of a constitutional dimension.

Second, Plaintiff has not established that MCDC or Madison County were deliberately indifferent to inadequate training or supervision. Plaintiff can show deliberate indifference by either (1) "failure to provide adequate training in light of foreseeable consequences that could result from lack of instruction" or (2) a failure "to act in response to repeated complaints of constitutional violations by its officers." *Ellis*, 455 F.3d at 700-01. Plaintiff has not produced evidence of a county or jail failure to act in response to repeated complaints; Hanson points to no other examples of alleged constitutional violations being committed by any of the jailer defendants. Further, as mentioned above, while it is arguably "inherently foreseeable" that failure to properly train deputies in the appropriate use of force could result in excessive force violations, Plaintiff produces no evidence identifying the inadequacy of the force training actually provided. Finally, Plaintiff does not even attempt to show a link between his allegations of failure train and/or supervise and the conduct at issue in this suit. Movants are entitled to summary judgment on this claim.

B. *State Law Claims*

As to each of Plaintiff's state law claims, the Madison County Defendants raise immunity defenses. DE #127-1, at 30-37. Hanson does not confront, discuss the law of, or in any way address Defendants' state immunity arguments. Further, Hanson did not reply in support of his own motion. The Court turns first to Defendants' immunity in their official capacities.

1.   Official Capacity Immunity

The Court generally applies "Kentucky governmental immunity law to [Plaintiff]'s state law claims." *Shepherd v. Floyd Cnty.*, 128 F. Supp. 3d 976, 980 (E.D. Ky. 2015); *see Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680-81, 685 (6th Cir. 2013) (applying federal immunity standard to federal claim and Michigan immunity standard to state law claim); *Chesher v. Neyer*, 477 F.3d 784, 796-97 (6th Cir. 2007) (applying Ohio immunity rules to Ohio-law claims); *Doe v. Magoffin Cnty. Fiscal Court*, 174 F. App'x 962, 971-72 (6th Cir. 2006) (applying Kentucky immunity law to Kentucky-law claims). There is no shortage of Kentucky decisions explicating the boundaries of state-law-based immunity. In fact, questions of immunity have "vexed the courts of the Commonwealth for decades." *Coppage Constr. Co., Inc. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 859 (Ky. 2015). In the context of this case, however, the boundaries are straightforward.

"Counties, which predate the existence of the state and are considered direct political subdivisions of it, enjoy the same immunity as the state itself." *Comair, Inc. v. Lexington-Fayette Urban Cnty. Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009). In general, "a state [or county] agency is entitled to immunity from tort liability to the extent that it is performing a governmental, as opposed to a proprietary, function." *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001); *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008) (same).[22] In the Commonwealth, operating a jail is a governmental function. *E.g.*, *Commonwealth v. Harris*, 59 S.W.3d 896, 899 (Ky. 2001) ("The jailer is a constitutionally elected officer of the county[.] . . . Thus, the official capacity claims are in essence claims alleging

---

[22] "A proprietary function is of the type normally engaged in by businesses or corporations and will likely include an element of conducting an activity for profit." *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 804 (Ky. 2009) (finding that fire departments engage in governmental functions).

negligent operation of the jail and are, therefore, claims against the county. This cloaks

the jailer, in his official capacity, with the county's sovereign immunity." (citations

omitted); *Smith v. Franklin County*, 227 F. Supp. 2d 667, 679-80 (E.D. Ky. 2002)

("Kentucky law teaches that official capacity claims that are in essence claims alleging

negligent operation of the jail are claims against the county, and that the jailer in his

official capacity is cloaked with the county's sovereign immunity[.]"). Additionally,

"when an officer or employee of a governmental agency is sued in his/her representative

capacity, the officer's or employee's actions are afforded the same immunity, if any, to

which the agency, itself, would be entitled[.]" *Yanero*, 65 S.W.3d at 522.

Here, Madison County is clearly entitled to state sovereign immunity based on its

county status. Similarly, MCDC, as a county jail operated, in fact, by the county, is

cloaked in sovereign immunity. Finally, the remaining jailer and deputy jailer defendants,

in their official capacities, are derivatively afforded the same protections against the

instant suit. Plaintiff does not argue against this immunity. Accordingly, Hanson's state

law claims against the Madison County Defendants in their official capacities fail.

### 2. Individual Qualified Immunity

In Kentucky,

Qualified official immunity applies to public officers or employees if their actions are discretionary (i.e., involving personal deliberation, decisions and judgment) and are made in good faith and within the scope of their authority or employment. This is intended to protect governmental officers or employees from liability for good faith judgment calls in a legally uncertain environment. An act is not 'discretionary' merely because some judgment is used in deciding on the means or method used. However, even if an act is discretionary, there is no immunity if it violates constitutional, statutory, or other clearly established rights, or if it is done willfully or maliciously with intent to harm, or if it is committed with a corrupt motive or in bad faith. The burden is on the plaintiff to show that the public official or employee was not acting in good faith.

> If the negligent acts of public officers or employees are ministerial, there
> is no immunity. An act is ministerial if the duty is absolute, certain, and
> imperative, involving mere execution of a specific act based on fixed and
> designated facts. If ministerial acts are proper, then the public officer or
> employee has official immunity without qualification. Any act done by a
> public officer or employee who knows or should have known that his
> actions, even though official in nature, would violate constitutional rights
> or who maliciously intends to cause injury, has no immunity.

*Autry*, 219 S.W.3d at 717 (citations removed). *Yanero* set the boundaries:

> Qualified official immunity applies to the negligent performance by a
> public officer or employee of (1) discretionary acts or functions, *i.e.*, those
> involving the exercise of discretion and judgment, or personal
> deliberation, decision, and judgment; (2) in good faith; and (3) within the
> scope of the employee's authority. . . .

> Conversely, an officer or employee is afforded no immunity from tort
> liability for the negligent performance of a ministerial act, *i.e.*, one that
> requires only obedience to the orders of others, or when the officer's duty
> is absolute, certain, and imperative, involving merely execution of a
> specific act arising from fixed and designated facts. . . .

> Once the officer or employee has shown prima facie that the act was
> performed within the scope of his/her discretionary authority, the burden
> shifts to the plaintiff to establish by direct or circumstantial evidence that
> the discretionary act was not performed in good faith.

65 S.W.3d at 522-23 (citation omitted). Kentucky recently confirmed the contours:

> Qualified official immunity applies to the negligent performance by a
> public officer or employee of (1) discretionary acts (2) in good faith; and
> (3) within the scope of the employee's authority. However, an officer or
> employee is afforded no immunity from tort liability for the negligent
> performance of a ministerial act. Ministerial acts or duties are those that
> require only obedience to the orders of others, or when the officer's duty is
> absolute, certain, and imperative, involving merely execution of a specific
> act arising from fixed and designated facts.

*Jones*, 260 S.W.3d at 345 n.1 (internal quotation marks, citations, and alterations

removed).

Accordingly, as to areas within the immunity sphere, public officials are generally not liable for "bad guesses in gray areas." *Caneyville Volunteer Fire Dep't*, 286 S.W.3d at 810. Thus, "in order to charge liability, a complainant may not merely allege injury, but must point to a causally related [v]iolation of a constitutional, statutory, or other clearly established right, or produce some proof that the action was not in good faith[.]" *Id.* (internal quotation marks and citations removed); *see also id.* ("[A] judgment call by a fire chief as to how, with what assistance, and in what manner to extinguish a fire is the very definition of a discretionary act."). Further:

> The question of when a task is ministerial versus discretionary has long plagued litigants and the courts. Generally, a governmental employee can be held personally liable for negligently failing to perform or negligently performing a ministerial act. Part of the rationale for allowing this individual liability is that a governmental agent can rightfully be expected to adequately perform the governmental function required by the type of job he does. To the extent his job requires certain and specific acts, the governmental function is thwarted when he fails to do or negligently performs the required acts. But when performance of the job allows for the governmental employee to make a judgment call, or set a policy, the fact that there is uncertainty as to what acts will best fulfill the governmental purpose has resulted in immunity being extended to those acts where the governmental employee must exercise discretion. To some extent, this says that governing cannot be a tort, but failing to properly carry out the government's commands when the acts are known and certain can be.
>
> Stated another way, properly performing a ministerial act cannot be tortious, but negligently performing it, or negligently failing to perform it, can be. And the law provides no immunity for such acts, meaning the state employee can be sued in court. Negligently performing, or negligently failing to perform, a discretionary act cannot give rise to tort liability, because our law gives qualified immunity to those who must take the risk of acting in a discretionary manner. *Whether* the employee's act is discretionary, and not ministerial, is the qualifier that must be determined before qualified immunity is granted to the governmental employee.

*Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014) (citations removed; emphasis in original). Qualified immunity "is more than just a defense; it alleviates the employee's or

officer's need even to defend the suit, which is to be dismissed." *Marson*, 438 S.W.3d at 298.

Here, the individual Madison County Defendants performed discretionary acts in managing Hanson's detention and pursuing jail order. While deputy jailers receive policies and guidelines to follow regarding the use of force, "the decision to administer force in an effort to maintain order and control in the facility is a discretionary act"; whether to apply force and the level to use involve personal decision-making and judgment calls. *Sherzinger v. Bolton*, 2013 WL 3166163, at *9 (W.D. Ky. June 20, 2013); *cf. Haug v. City of Louisville*, 242 S.W.3d 683, 687 (Ky. Ct. App. 2007) (holding a peace officer's decision to "storm" a residence and use non-lethal force to quickly subdue a mentally ill suspect was discretionary). Additionally, as to Jailer Thomas, any hiring decisions are inherently discretionary. *Yanero*, 65 S.W.3d at 528 ("Evaluating the credentials of a prospective employee is an inherently subjective process which, of course, is the essence of a discretionary function."). Similarly, the content and method of training staff is discretionary. *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 480 (Ky. 2006) ("The training of the staff and state prisoners [under the circumstances] was a discretionary act or function."). Ultimately, all alleged conduct under the several state law claims advanced by Plaintiff involved discretionary acts.

As for the other qualified immunity elements, Plaintiff offers nothing to show that the individual defendants acted in bad faith or that they violated any clearly established right.[23] "Negligently performing, or negligently failing to perform, a discretionary act cannot give rise to tort liability[.]" *Marson*, 438 S.W.3d at 296. There is utterly no

---

[23] In fact, Plaintiff fails to address Defendants' qualified immunity argument in any way.

Case: 5:14-cv-00099-REW   Doc #: 160   Filed: 01/23/17   Page: 41 of 41 - Page ID#: 2116

indication that the individual defendants willfully or maliciously intended to harm Plaintiff. *Sloas*, 201 S.W.3d at 481. Further, there is no dispute that the deputies acted within the scope of employment when they used the force at issue in this case. Accordingly, because the deputies' actions were discretionary, made in good faith, and within the scope of their employment, each is entitled to qualified immunity. *Autry*, 219 S.W.3d at 717. They can thus face no liability on the state charges, and the Court must dismiss them. *Marson*, 438 S.W.3d at 298.

## IV.     Conclusion

For the forgoing reasons, the Court fully **GRANTS** DE #127 and **DENIES** DE #130. The Court will enter a separate judgment.[24]

This the 23d day of January, 2017.

Signed By:

*Robert E. Wier*   *REW*

**United States Magistrate Judge**

---

[24] Given that the Court fully grants DE #127 and denies DE #130, the Court **DENIES AS MOOT** the Madison County Defendants/Third Party Plaintiffs' Motion for Default Judgment against certain Third Party Defendants (DE #125) and Richmond City Third Party Defendants' Motion for Summary Judgment against Madison County Defendants/Third-Party Plaintiffs (DE #129). With the Court granting summary judgment in favor of the Madison County Defendants on all of Plaintiff's claims, the claims asserted by Defendants/Third-Party Plaintiffs against the Third-Party Defendants for indemnity, contribution, and apportionment are moot. The Court further **DENIES AS MOOT** Madison County Defendants' *Daubert* motion (DE #126) and Plaintiff's *Daubert* motion (DE #131). The instant memorandum opinion and order resolves all claims.